HOYT E. HART II, SBN 125088, hoyth@prodigy.net
ATTORNEY AT LAW
P.O. Box 675670
Rancho Santa Fe, CA  92067
Telephone:    858.756.1636
Facsimile:    858.756.1407

CRAIG H. MILLET, SBN 106027, cmillet@gibsondunn.com
DOUGLAS LEVIN, SBN 263951, dlevin@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA  92612-4412
Telephone: 949.451.3800
Facsimile:  949.451.4220

Attorneys for Plan Proponents the NV Creditors

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>THE LITTLE SAIGON NEWS INCORPORATED,<br><br>           Debtor.<br>-------------------------------------------------<br>In re:<br><br>BRIGITTE LAURE HUYNH,<br><br>           Debtor.<br>-------------------------------------------------<br><br>AFFECTS ONLY DEBTOR LITTLE SAIGON NEWS INCORPRATED. | CASE NO. 8:15-bk-11875-MW<br><br>Chapter 11<br><br>Jointly Administered with<br>Case No. 8:15-bk-11876-MW<br><br>**REPLY IN SUPPORT OF CONFIRMATION OF THE NV CREDITORS' CHAPTER 11 PLAN OF REORGANIZATION FOR DEBTOR LITTLE SAIGON NEWS DATED SEPTEMBER 29, 2015**<br><br>**Hearing:**<br>Date:      February 3, 2016<br>Time:      2:00 p.m.<br>Place:     Courtroom 6C<br>Judge:    Hon. Mark S. Wallace |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. THE OBJECTIONS AS TO CLASSIFICATION, UNFAIR DISCRIMINATION,
FEASIBILITY AND BAD FAITH ARE ALL MOOT IF THE COURT APPROVES
THE PLAN'S PROPOSED DISALLOWANCE, RECHARACTERIZATION OR
SUBORDINATION OF THE INSIDER CLAIMS ................................................ 4

    A.    Classification ............................................................................................ 4

    B.    Unfair Discrimination .............................................................................. 5

    C.    Feasibility ................................................................................................ 6

    D.    Bad Faith ................................................................................................. 7

III. RECHARACTERIZATION OR SUBORDINATION OF THE INSIDER CLAIMS ................. 8

    A.    The Disallowance, Recharacterization or Subordination of Le's Purported
Claim is Addressed in the Briefing Concerning Le's Claim and Set for Hearing
Two Days Before the Confirmation Hearing ........................................... 8

    B.    The Debtors' Objection Offers *No Response* to the Recharacterization of
Huynh's Claim and a Purely Nominal Response to the Subordination of Her
Claim ...................................................................................................... 10

        1.    Recharacterization ...................................................................... 10

        2.    Subordination ............................................................................. 11

IV. THE "OTHER DEFECTS" ALLEGED IN THE OBJECTIONS LACK MERIT ............ 13

    A.    The Exculpation Provision is Proper and Consistent With Ninth Circuit
Authority Because It Is Narrowly Tailored to Pre-Effective Date Claims
Related to the Plan and the Chapter 11 Cases, It Contains Appropriate
Carveouts, and It Is Appropriate Given the Substantial Consideration to be
Paid by the Plan Proponents ................................................................... 13

    B.    Preserved Right to Pursue Discovery Under Rule 2004 ........................ 17

    C.    Definition of "Substantial Consummation" ......................................... 17

    D.    Affiliations of the Officers and Directors of the Reorganized Debtor ...... 18

V. CONCLUSION ................................................................................................. 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

i

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

5

*A.R. Lantz Co. v. United States*,
424 F.2d 1330 (9th Cir. 1970)...................................................................................................10

6

*American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*,
885 F.2d 621 (9th Cir. 1989)............................................................................................13, 15

7

8

*Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*,
526 U.S. 434 (1999) 526 U.S. ..................................................................................................7

9

10

*In re Bashas' Inc.*,
437 B.R. 874 (Bankr. D. Ariz. 2010) .........................................................................................6

11

12

*Bauer v. Commissioner*,
748 F.2d 1365 (9th Cir. 1984).................................................................................................10

13

14

*In re BLX Group Inc.*,
2011 Bankr. LEXIS 4505 (Bankr. D. Mont. Nov. 22, 2011)...............................................15, 16

15

16

*In re Express One International, Inc.*,
217 B.R. 215 (BC E.D. Tex. 1998) ...........................................................................................17

17

*Ghirardo v. Antonioli*,
8 Cal. 4th 791 (Cal. 1994) .......................................................................................................10

18

19

*Hameetman v. California Franchise Tax Bd.*,
2006 Cal. App. Unpub. LEXIS 11132 (Cal. App. 2d Dist. Dec. 11, 2006)...................................10

20

21

*In re Lighthouse Lodge, LLC*,
2010 Bankr. LEXIS 3663, 2010 WL 4053984 (Bankr. N.D. Cal. Oct. 14, 2010)...................14, 15

22

*In re Lowenschuss*,
67 F.3d 1394 (9th Cir. 1995)..............................................................................................13, 15

23

24

*In re Mega RV Corp.*,
Case No. 8:14-bk-13770-MW (Bankr. C.D. Cal. Aug. 4, 2015) ...............................................14

25

26

*In re Metricom, Inc.*,
275 B.R. 364 (Bankr. N.D. Cal. 2002)......................................................................................13

27

28

*Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*,
714 F.3d 1141 (9th Cir. 2013)..................................................................................................10

1

2

**TABLE OF AUTHORITIES**
(continued)

Page(s)

3

4

*In re Plant Insulation Co.*,
    2012 Bankr. LEXIS 1716 (Bankr. N.D. Cal. Mar. 15, 2012) ....................................15, 16

5

*In re Riviera Drilling & Exploration Co.*,
    2012 Bankr. LEXIS 5991 (Bankr. D. Colo. Dec. 19, 2012) ..........................................7

6

7

*Steelcase Inc. v. Johnston (In re Johnston)*,
    21 F.3d 323 (9th Cir. 1994)..........................................................................................5

8

9

*In re Trikeenan Tileworks, Inc.*,
    2011 Bankr. LEXIS 2673 (Bankr. D.N.H. 2011) ...........................................................7

10

*Underhill v. Royal*,
    769 F.2d 1426 (9th Cir. 1985)......................................................................................13

11

12

*In re VOX II, LLC*,
    2008 Bankr. LEXIS 556 (Bankr. D. Md. Mar. 4, 2008) ...............................................17

13

14

*In re WCI Cable, Inc.*,
    282 B.R. 457 (Bankr. D. Or. 2002)..............................................................................13

15

*In re Western Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003).....................................................................14, 15

16

**Statutes**

17

11 U.S.C. § 502(a) .............................................................................................................8

18

11 U.S.C. § 1101(2)(A)-(B) ...............................................................................................18

19

11 U.S.C. § 1125(e) ...........................................................................................................15

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

Plan Proponents Nguoi Viet Daily News, Inc. and Dat Huy Phan (collectively the "***Plan Proponents***" or "***NV Creditors***") hereby submit this Reply (the "***Reply***") in support of confirmation of the *NV Creditors' Chapter 11 Plan of Reorganization for Little Saigon News, Inc., Dated September 29, 2015* [Dkt. No. 141] (the "***Plan***"), in further support of the *Memorandum of Law in Support of Confirmation of the NV Creditors' Chapter 11 Plan of Reorganization for Debtor Little Saigon News Dated September 29, 2015 Pursuant to Section 1129(a)* [Dkt. No. 210] (the "***Confirmation Brief***") and the companion *Memorandum of Law in Support of Confirmation of the NV Creditors' Chapter 11 Plan of Reorganization for Debtor Little Saigon News Dated September 29, 2015 Pursuant to the "Cram Down" Provisions of Section 1129(b)* [Dkt. No. 212] (the "***Cramdown Memorandum***"), and in response to the Debtors' *Objection to NV Creditor's Plan* [Dkt. No. 230] (the "***Debtors' Objection***") and *Joseph Le and Stephen B. Holliday's Objection to Confirmation of NV Creditors' Plan* [Dkt. No. 226] (the "***Le/Holliday Objection***" and together with the Debtors' Objection, the "***Objections***").[1]

# I.
# INTRODUCTION

The central argument in the Objections is that it is improper for the Plan to recharacterize or subordinate the purported Claims of Brigitte Huynh ("***Huynh***") and her son, Joseph Le ("***Le***") (collectively, the "***Insider Claims***").[2]  In the event the Insider Claims are not both disallowed, recharacterized or subordinated, the NV Creditors will determine whether to amend or rescind the Plan.  If, however, the Court approves the disallowance, recharacterization or subordination of the Insider Claims proposed in the Plan (and assumed for purposes of this Reply), then the main arguments in the Objections will be **moot**:

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings set forth in the Definitions set forth in Exhibit A to Plan.

[2]  The issue of the disallowance, recharacterization or subordination of the purported Le Claim is fully briefed in connection with the NV Creditors' *Motion for Order Disallowing Claims of Joseph Le [Claim No. 10]* [Dkt. No. 191] (the "***Motion to Disallow Le Claim***") and Le's *Motion for Order: (1) Deeming Proof of Claim Timely; and (2) Allowing Claim* [Dkt. No. 229] (the "***Motion to Allow Le Claim***"), both of which are set for hearing on February 1, 2016, two days before the Confirmation Hearing.  To minimize redundancy, this Reply does not re-argue the points pertaining to the purported Le Claim.

Gibson, Dunn &
Crutcher LLP

| Objection | Response |
|---|---|
| The Plan improperly classifies the Insider Claims separately from "similar" General Unsecured Claims in Class 2. | If the Court determines that the Insider Claims should be recharacterized or subordinated, then they would not be substantially similar to General Unsecured Claims in Class 2, their separate classification would be required under Section 1122(a), and this objection would be moot. |
| The Plan unfairly discriminates against Le and Huynh because the Plan does not allocate any payment to them whereas General Unsecured Claims "of the same legal character" as the Insider Claims will be paid 100%. | If the Court determines that the Insider Claims should be recharacterized or subordinated, then the Insider Claims would not be "of the same legal character" as the General Unsecured Claims in Class 2, and this objection would be moot. |
| The Plan is not feasible because it is not supported by proof of adequate funding and it does not properly account for the Insider Claims. | If the Court determines that the Insider Claims should be disallowed, recharacterized or subordinated, then the NV Creditors' Funding Commitment would not have to cover the Insider Claims, the **$400,000 deposit** by the Plan Proponents would provide more than adequate assurance of their ability to fund the payments under the Plan (even if, according to the Objections, professional fees will exceed the estimate in the Plan), and this objection would be moot. |
| The Plan is submitted in bad faith and the votes approving the Plan should be designated because the Plan Proponents' goal is to usurp the Debtor's business base and assets and ultimately "put the Debtors out of business." | If the Court determines that the Insider Claims should be disallowed, recharacterized or subordinated, then the Plan cannot be in bad faith for treating them accordingly, and this objection would be moot.  Case law rejects the argument that a plan proponent's acquisition of control over a competitor (debtor) is proof of bad faith. The circumstances of the Plan further preclude a finding of bad faith: the Debtor still has not filed a plan; the Plan Proponents justifiably distrust the Debtors; the Plan Proponents took control over their own destiny by submitting a sincere, viable Plan that would pay Allowed General Unsecured Claims and Allowed Administrative Expense Claims in full in cash. |

Notably, the Debtors' Objection offers *no response* to the comprehensive argument in the Cramdown Memorandum, supported by ample authority, that the Huynh Claim should be recharacterized, and it offers only a *nominal response* to the subordination of the Huynh Claim.

Huynh's utter failure to oppose these requests in the Debtors' Objection (or in any other pleading currently on file) should be deemed a waiver of Huynh's objection and an admission that the facts set forth in the Cramdown Memorandum establish sufficiently that the Huynh Claim should be disallowed, recharacterized or subordinated.

The other "defects" raised in the Objections lack merit:

| Objection | Response |
|---|---|
| The Plan's exculpation provision constitutes an improper non-debtor third-party release. | The exculpation provision in § XI.D of the Plan (the ***Exculpation Provision***") comports with Ninth Circuit authority because it is narrowly tailored to pre-Effective Date claims related to the Chapter 11 Cases and the Plan, it reasonably exceeds the protections already given to the Plan Proponents under Section 1125(e), and it is supported by abundant consideration via the Plan Proponents' funding of the Plan which pays Allowed General Unsecured Claims and Allowed Administrative Expense Claims in full in cash. |
| The Plan improperly preserves the right to pursue discovery under Rule 2004 for the Reorganized Debtor after the Confirmation Date. | Case law holds that Rule 2004 discovery is available post-confirmation.  Such rights are a necessary tool for the Reorganized Debtor to identify or locate Assets of the Reorganized Debtor.  The objecting parties may raise appropriate objections to post-Confirmation discovery if and when it is requested. |
| The definition of "substantial consummation" is improper because payments to General Unsecured Creditors might not occur until after the payment of Administrative Expense and Non-Tax Priority Claims (which trigger substantial consummation under the Plan). | Le and Holliday (who raise this objection) lack standing to raise this objection because it will not affect either of them: Le will not receive any payments under the Plan and Holliday will receive any payment (or payment to him will be segregated) prior to substantial consummation. In any event, as of the payment of Administrative Expense and Non-Tax Priority Claims (i.e., the commencement of distributions under the Plan), the Assets of the Debtor will have vested in the Reorganized Debtor and the stock of the Reorganized Debtor will have been issued in the new owners, thus satisfying each of the elements under Section 1101(2). |
| The Plan fails to address the affiliations of the individuals designated as the initial officers and directors of the Reorganized Debtor, and whether their appointment is consistent with the interests | Le and Holliday (who raise this objection) lack standing to raise this objection because it will not affect either of them: neither individual will have any affiliation with the Reorganized Debtor, and |

| of creditors, equity holders and the public. | payments to Holliday will not be affected by the success of the Reorganized Debtor.  In any event, the Plan *does* disclose the affiliations of the initial officers and directors of the Reorganized Debtor.  Especially considering the circumstances of the Plan (payment in full in cash of all Allowed General Unsecured Claims and Allowed Administrative Expense Claims, which payments will not depend on the success of the Reorganized Debtor), there is no basis upon which to conclude that the appointment of such individuals is not in the interests of creditors, equity holders or the public. |

## II.
### THE OBJECTIONS AS TO CLASSIFICATION, UNFAIR DISCRIMINATION, FEASIBILITY AND BAD FAITH ARE ALL MOOT IF THE COURT APPROVES THE PLAN'S PROPOSED DISALLOWANCE, RECHARACTERIZATION OR SUBORDINATION OF THE INSIDER CLAIMS

**A.     Classification**

The Objections argue that the Plan's classification scheme violates Section 1122(a) (and Section 1129(b)(1)) because the Insider Claims belong in Class 2 with General Unsecured Claims and the Plan's classification scheme represents gerrymandering of an impaired consenting class. However, this objection becomes moot if the Court approves the Plan's recharacterization or subordination of the Insider Claims because, in that case, the Insider Claims would not be "substantially similar" to those in Class 2 and Section 1122(a) would require their separate classification.

Moreover, contrary to the Objections' assertion that the Insider Claims were classified separately *solely* on account of Huynh's and Le's status as insiders, the Insider Claims are classified separately in Class 4 on account of legitimate reasons:

(a) The Insider Claims are of a fundamentally different nature from the General Unsecured Claims in Class 2.  For example, the Debtor's Amended Schedule F describes Le's disputed Claim as "Loans*/Gifts to Company*" and it describes Huynh's Claim as "Loans*/Capital Contributions*," thus demonstrating that neither Insider Claim is "pure debt" like the trade debt Claims of General Unsecured Creditors).

(b) Huynh and Le occupied positions of superior knowledge and power compared to "innocent" General Unsecured Creditors.

(c) Huynh and Le were both involved in the intentional misconduct resulting in the Judgment and the Debtor's demise.  Huynh committed the defamation and Le was at least involved in funding Huynh's defense, which, even if such funding was not wrongful *per se*, nevertheless arises from Huynh's inequitable conduct.  It would be inequitable and it would undermine the jury's punitive damage award to place the victims of Huynh's misconduct and the Debtor's innocent creditors in the same Class as the Insider Claims.

*See* Confirmation Br. at 6:3-7:26; Cramdown Memo. at 4:23-7:19.

## B.    Unfair Discrimination

Similar to the objection as to classification, the Objections argue that the Plan unfairly discriminates against the Insider Claims because such Insider Claims will not receive any payments under the Plan even though they are "similarly situated" to the General Unsecured Claims in Class 2. Le/Holliday Obj. at 9:7-12.  The Plan, however, presumes the Insider Claim are ***not*** similarly situated and that, even though the Plan discriminates against the Insider Claims, such discrimination is ***fair*** because there are "reasonable, nondiscriminatory reasons for it" – namely, the reasons underlying the recharacterization and subordination issues.  *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 328 (9th Cir. 1994); *see* Cramdown Memo. at 3:5-7:19 (summarizing cases approving the disparate treatment of claims of insiders who possessed superior knowledge or authority compared to "innocent" creditors or who committed wrongdoing that contributed to the debtor's demise).  This objection is thus moot if the Court approves the Plan's recharacterization or subordination of the Insider Claims in their entirety, as there would be reasonable, nondiscriminatory reasons to treat the Insider Claims different from (indeed, inferior to) General Unsecured Claims and the degree of discrimination would be directly related to the basis for the discrimination.[3]

---

[3]    Le argues that because he was not personally involved in Huynh's defamation against the Judgment Creditors and because insider status alone is insufficient to justify discriminatory treatment, the NV Creditors can only seek to recharacterize or subordinate his Claim (if at all) to

*(Cont'd on next page)*

**C.      Feasibility**

The Objections argue that the Plan is not feasible because the **$400,000 set aside by the Plan**

**Proponents** fails to take into account the Insider Claims and because actual Professional Fee Claims

may exceed those estimated by the Plan Proponents. Le/Holliday Obj. at 18:24-20:10; Debtors' Obj.

at 3:4-8.  The failure to set aside sufficient funds to pay the Insider Claims is clearly moot if the Court

approves the Plan's disallowance, recharacterization or subordination of the Insider Claims.  Thus,

the only issue is whether the Plan Proponents have provided sufficient assurance of their ability to

fund the payments under the Plan.  They have.

None of the cases cited in the Objections involved a deposit as substantial as the Plan

Proponents' $400,000 deposit.  *See, e.g.*, Debtors' Obj. at 4:14-5:2.  Even if Allowed Professional

Fee Claims exceed those estimated by the Plan Proponents, the Objections cite no authority for the

proposition that the Plan Proponents "must post enough cash to cover <u>all</u> contingencies."

Le/Holliday Obj. at 20:9-10 (emphasis in original).  That is not so, as feasibility does not require a

100% guarantee.  *See In re Bashas' Inc.*, 437 B.R. 874, 915 (Bankr. D. Ariz. 2010) ("A plan meets

this feasibility standard if the plan offers a reasonable prospect of success and is workable. . . .  The

prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a

guarantee of the future is not required. . . .  The mere potential for failure of the plan is insufficient to

disprove feasibility.") (citations and quotations omitted).

The Plan Proponents have been forthright with this Court throughout the Chapter 11 Cases

and there is simply no basis to suspect the Plan is a "visionary scheme" or to distrust the Plan

Proponents' intention or ability to fund the payments under the Plan, especially considering they have

already deposited $400,000 into a segregated account (and they have also clearly expended

significant resources on legal and expert fees in these cases).  In any event, the NV Creditors would

_____

*(Cont'd from previous page)*

the extent he funded Huynh's legal defense. Le/Holliday Obj. at 9:17-10:11, 10:12-11:12.
However, the Plan Proponents seek to recharacterize or subordinate the Le Claim in its entirety
because Le's inequitable conduct far exceeds the funding of Huynh's legal defense and includes,
most notably, his assertion of a false claim in the amount of $1 million that is contrary to his
sworn testimony in this case.

1  be inclined to supply virtually any further assurance the Court deems necessary (e.g., proof, as

2  requested by Le and Holliday, that the $400,000 is "still there").

3  **D.    Bad Faith**

4        The Objections argue that the Plan is in bad faith and the Votes cast to approve the Plan

5  should be designated because the real purpose of the Plan is "to effectuate the hostile takeover of a

6  despised competitor." *See* Le/Holliday Obj. at 23:2-9; Debtors' Obj. at 14:1-15:2.  That allegation,

7  however, fails as a matter of law to establish bad faith.  *See In re Trikeenan Tileworks, Inc.*, 2011

8  Bankr. LEXIS 2673, at *23-24 (Bankr. D.N.H. 2011) ("[T]he Debtors argue that Butler's Plan was

9  not proposed in good faith because Butler is simply trying to destroy a competitor.  Butler's status as

10  a competitor is a disputed issue of fact.  Even assuming that Butler is a direct competitor, the Debtors

11  have failed to explain how Butler's Plan is in contravention of the policy goals of the Bankruptcy

12  Code.  Being a competitor who proposes a competing plan to take over the debtor does not equal bad

13  faith per se.  To the contrary, the Supreme Court has noted that lifting exclusivity to propose a

14  competing plan opens the door for other parties to bid for the equity of the company.  *LaSalle*, 526

15  U.S. at 457-58.  There is no requirement that a competing plan must be friendly to the existing

16  management or ownership of a debtor.  Nor is there any bar in the Bankruptcy Code against a

17  competitor proposing a take over of the debtor."); *In re Riviera Drilling & Exploration Co.*, 2012

18  Bankr. LEXIS 5991, at *17 (Bankr. D. Colo. Dec. 19, 2012) (same proposition).

19        The objective circumstances of the Plan affirmatively demonstrate that the Plan and the votes

20  thereon are in good faith.  At the onset of the Chapter 11 Cases, the NV Creditors identified major

21  inconsistencies, omissions, false statements and other problems with the Debtors' financial

22  disclosures and sworn testimony.  The NV Creditors' concerns proved to be well-founded as their

23  efforts led to material amendments to the Debtor's disclosures that dramatically changed the

24  landscape of the Chapter 11 Cases.  The NV Creditors were openly skeptical there would ever be

25  meaningful progress in the Chapter 11 Cases or that the Debtor, acting through Huynh (who

26  previously used the Debtor to intentionally harm the NV Creditors), would ever be frank with the NV

27  Creditors.  When the Debtor failed to extend the exclusive period to file a plan, the NV Creditors

28  opted to seize their own destiny rather than hope for the best by submitting their own Plan on terms

1    acceptable to them and highly favorable to all non-insider parties.  (Despite repeated assurances that a

2    plan would be forthcoming, the Debtor still has not filed a plan nine months into the Chapter 11

3    Cases.)  The Plan promises to pay all Allowed General Unsecured Claims and Allowed

4    Administrative Expense Claims in full in cash.  In addition to funding such payments, the Plan

5    Proponents agreed to waive a significant portion of their Judgment.  The Plan thus represents the

6    model of good faith.

### III.
### RECHARACTERIZATION OR SUBORDINATION OF THE INSIDER CLAIMS

**A.    The Disallowance, Recharacterization or Subordination of Le's Purported Claim is Addressed in the Briefing Concerning Le's Claim and Set for Hearing Two Days Before the Confirmation Hearing**

As discussed *supra* in footnote 2, the issue of the disallowance, recharacterization or

subordination of the Le Claim is fully briefed and set for hearing on February 1, 2016.  To minimize

redundancy, this Reply does not recite the arguments or authority regarding the Le Claim, except to

raise the following points in response to new arguments and admissions in *Joseph Le's Reply in*

*Support of Motion for Allowance of Claim* [Dkt. No. 232]:

1.    Le argues that a four-year statute of limitations applies to his "loans" because the

checks at issue had a "loan" denotation on them and thus his claims are "based on a writing" (if they

were based on an oral agreement the statute would be only two years).  However, the Le Claim

includes "loans" made more than four years prior to the petition date.  **Le admits such claims are**

**time-barred** but argues that only the Debtor (not the NV Creditors), as obligor, has standing to

**raise the statute of limitations defense, and the Debtor has deliberately opted not to raise the**

**defense here**.  *Id*. at 15:11-16:9.  That is not so, as a claim can only be allowed under Section 502 if

it is enforceable against the Debtor's estate, and any "party in interest" can object to a claim's

allowance under Section 502(a).  *See* 11 U.S.C. § 502(a).  If true, this admission also establishes

further inequitable conduct by Huynh and indicates that the Debtors' counsel is not fulfilling its duty

to the Debtor's estate because they are deliberately waiving the statute of limitations to help an

insider recover a substantial disputed claim at the expense of non-insider Creditors.

Gibson, Dunn &
Crutcher LLP

2.     Le admits that the Debtor only realized or determined that the purported transfers from Le were loans "upon considered reflection," proving the Debtor did *not* believe they were loans at all relevant times (specifically, the time of the transfers) and the Debtor could not have intended to incur loans from Le.  *Id*. at 16:1-2 ("Here, the obligor, Little Saigon, has not asserted the [statute of limitations] defense.  Indeed, ***upon considered reflection, the obligor admits to the debt***.") (emphasis added).

3.     Le argues that the NV Creditors' have not provided any evidence supporting the recharacterization or subordination of his purported Claim.  However, the NV Creditors cited ample evidence provided by Le and the Debtors including, but not limited to: (a) the Debtor's initial Schedules and SOFA, and List of 20 Largest Unsecured Creditors, none of which mention any claim of Le; (b) Huynh's repeated, unequivocal sworn testimony in declarations and at the Section 341(a) meeting that any transfers from Le were gifts, not loans; (c) Le's sworn testimony that he is not a relevant witness in these Chapter 11 Cases and that a "total" of $255,000 remained unpaid to him (without mentioning any loans made by or "through" Ally Nguyen); and (d) the Debtor's Amended Schedule F, which separately lists disputed claims of Le and Nguyen and contains the description "Loans/Gifts To Company" for each.  This ***direct evidence*** is highly relevant –indeed, conclusive‒ as to the Debtor's intent with respect to any transfers from Le.  That the Debtor ***now*** believes they were loans "upon considered reflection" does not "neutralize" this evidence.  *Id*. at 10:4-9.

4.     Le admits that he knew the NV Creditors believed, based on Le's own sworn testimony, the "total" amount unpaid to him was $255,000.  Le now claims that testimony was untruthful because he was really owed $1 million on account of undisclosed "loans" made "through" Ally Nguyen.  Le never rectified that untruthful testimony and now blames the NV Creditors because "they could have taken discovery and undoubtedly would have learned of this factor."  *Id*. at 26:8-9.

5.     Le agrees with the NV Creditors that his purported Claim should be reduced to reflect that certain professional fees included in his Claim are attributable to Huynh rather than the Debtor.  *Id*. at p.5 n.2.  For the same reason, to the extent they are Allowed (if any), Le's "loans" should be deemed attributable to Huynh rather than the Debtor (or at least prorated) because Le admits he made the loans to help his mother, not based on the Debtor's creditworthiness.

**B.      The Debtors' Objection Offers *No Response* to the Recharacterization of Huynh's Claim and a Purely Nominal Response to the Subordination of Her Claim**

By now, the Court has received significant briefing concerning the recharacterization or subordination of the [purported Le Claim.  However, the Cramdown Memorandum [Dkt. No. 212] was the first filing to raise the argument, supported by ample authority, that the Huynh Claim should be recharacterized or subordinated.  **The Debtors' Objection provides <u>no response</u> to the argument (or supporting authority) that the Huynh Claim should be recharacterized, and it provides a <u>nominal response</u> to the argument that the Huynh Claim should be equitably subordinated.**  *See* Debtors' Obj. at 12:7-13:25.  Accordingly, the Court should determine that Huynh has waived any objection to the recharacterization of her Claim and, to the extent necessary, Huynh should be deemed to have waived any objection to the subordination of her Claim or admitted that the facts alleged in the Cramdown Memorandum sufficiently prove "inequitable conduct" warranting subordination.

**1.      Recharacterization**

The Cramdown Memorandum demonstrates how evidence admitted in this Chapter 11 Case, including the sworn testimony of Huynh, the Debtor's Initial Schedules and SOFA, and the List of 20 Largest Unsecured Creditors, supports at least twelve facts (sometimes referred to as the "*Autostyle Factors*")[4] indicating that any transfers from Huynh to the Debtor bore none of the indicia of an

---

[4]  The Cramdown Memorandum explains that the Ninth Circuit in *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141 (9th Cir. 2013), held that "in order to determine whether a particular obligation owed by the debtor is a 'claim' for purposes of bankruptcy law, it is first necessary to determine whether that obligation gives the holder of the obligation a 'right to payment' under state law." *Id*. at 1149.  Under California law, "[t]he question of whether an advance is debt or equity is 'primarily directed at ascertaining the intent of the parties.'"  *Hameetman v. California Franchise Tax Bd.*, 2006 Cal. App. Unpub. LEXIS 11132, at *11 (Cal. App. 2d Dist. Dec. 11, 2006) (attached hereto as **Attachment A**) (quoting *Bauer v. Commissioner*, 748 F.2d 1365, 1367 (9th Cir. 1984)); *see also Ghirardo v. Antonioli*, 8 Cal. 4th 791, 802 (Cal. 1994) (in determining whether a transaction bears "the attributes of a loan," California state law looks to substance rather than form, such that "if it does not look like a duck, does not walk like a duck, and does not quack like a duck, it is not likely to be a duck").  Although *Hancock* declined to adopt the *Autostyle* Factors as a "federal test" for recharacterization, those factors are certainly relevant to ascertaining the parties' intent.  Thus, the Court should consider factors such as the *Autostyle* Factors as a means of ascertaining the parties' intent as other courts in the Ninth Circuit have done.  *See, e.g.*, *Bauer*, 748 F.2d at 1367-68 (listing factors similar to the *Autostyle* Factors in order to ascertain the parties' intent); *A.R. Lantz Co. v. United States*, 424 F.2d 1330, 1333-34 (9th Cir. 1970) (same).

arm's length loan and that Huynh (acting as both obligor and obligee) could not have been intended such transfers to be true loans.  *See* Cramdown Memo. at 12:15-19:13.  Those facts included that: (a) there was no promissory note or other loan documents, no security given for the "loans," no amortization or payment schedule, no maturity date, no interest rate (or interest payments), and no sinking fund or interest reserve; (b) the "repayments" (controlled by Huynh) were made at random intervals depending on the Debtor's ability to make such "repayments"; (c) at the time of Huynh's "loans," the Debtor was undercapitalized and the Debtor likely could not obtain financing from outside (non-insider) sources; (d) Huynh is the 100% stockholder of the Debtor; and (e) Huynh treated her own "Claim" as subordinated by not including it in the Debtor's initial filings, and later including it in the Debtor's Amended Schedule F with the description "Loans*/Capital Contributions*."  *Id*.  Notably, despite asking this Court to Allow her $835,546 Claim against the Debtor, Huynh's Schedules in her own Chapter 11 Case *still* do not reflect any claim against the Debtor as an asset of her estate.

**Huynh's failure to respond to any of the *undisputed facts* should be deemed a waiver or an admission**.

### 2.    Subordination

The Cramdown Memorandum provides a thorough summary of the facts and law supporting the Plan's subordination of the Huynh Claim, including that: (a) as an insider of the debtor both as a matter of law and as a matter of fact, the Court should give Huynh's actions "rigorous scrutiny" under the standard of "simple unfairness"; (b) since the Plan Proponents provided sufficient substantiations of misconduct by Huynh, the burden has shifted to Huynh to establish that her dealings with the Debtor had "all the earmarks of an arm's length bargain"; (c) pre-petition, Huynh used her control over the Debtor to advance her own personal agenda and to deliberately harm the Judgment Creditors, resulting in the $4.5 million Judgment (including punitive damages on account of "malice, oppression or fraud") against the Debtor and Huynh personally; (d) post-petition, Huynh has given sworn testimony that, according to her current position, was untrue (e.g., stating that pre-petition she had only made capital contributions to the Debtor); (e) Huynh made unauthorized post-petition "loan repayments" to insider Ally Nguyen (her son's significant other); and (f) it would be

inequitable not to subordinate the Huynh Claim to the Claims of the victims of her intentional

misconduct and other "innocent" trade creditors.  *See* Cramdown Br. [Dkt. No. 212] at 19:15-24:16.

**The Debtors' Objection failed to address *any* of these factual allegations**.  The ***only***

response to the subordination of the Huynh Claim in the Debtors' Objection is: (a) a recitation of the

arguments regarding classification and discrimination; (b) general statements that equitable

subordination is an "unusual remedy" and is "remedial, not penal," and that "[m]ere status as an

insider is not sufficient grounds for subordination," and (c) an apparent argument that the Plan itself

(as opposed to the Confirmation Brief and Cramdown Memorandum) does not provide the full legal

basis for the subordination of the Huynh Claim.  *See* Debtors' Obj. at 12:7-13:25.  This failure to

address, much less oppose, the facts summarized above and in the Cramdown Memorandum should

be deemed a waiver or an admission by Huynh that such facts establish sufficient "inequitable

conduct" to justify subordination.

**Huynh's inequitable conduct has continued even after the filing of the Cramdown**

**Memorandum**.  Since the beginning of this Chapter 11 Case, Huynh has been "adamant" in her

sworn testimony that any transfers from Le were "gifts," not loans, and that "Mr. Le is not a creditor

of the Debtor."  Debtors' Opp. to Mot. to Convert [Dkt. No. 91] at 25:23-26:5; Initial P&S

Application [Dkt. No. 34] ¶ 30, Huynh Decl. ¶ 11.  On January 15, 2016, over nine months after the

Petition Date, Huynh provided a sworn declaration in support of *Joseph Le's Opposition to NV*

*Creditors' Motion for Order Disallowing Claim No. 10* [Dkt. No. 219] that unequivocally ***reversed***

***her prior sworn testimony*** in an apparent effort to thwart the "hostile takeover" of her company.

| Huynh's Prior Testimony (July 20, 2015) | Huynh's January 2016 Testimony |
|---|---|
| "Over the years, the monies Le gave to the Debtors started to add up to large sums of money.  **The Debtors always considered the monies received from Le as gifts**."  Huynh Decl. ¶ 57 [Dkt. No. 91] (emphasis added).<br><br>**It has always been my belief position [sic] that the advances made by Le to me and Little Saigon were gifts** as there were never any documents evidencing the advances as loan transactions, or any agreement oral or otherwise characterizing them as loans."  *Id*. ¶ 59 (emphasis added). | "I never believed that the money Joseph loaned before Little Saigon filed bankruptcy was a gift."  Decl. of B. Huynh [Dkt. No. 219] ¶ 11 (emphasis added). |

| When preparing the schedules, **I <u>always</u> believed that any monies received by me or Little Saigon from my son were merely gifts**, as would be any money he advanced for the payment of attorneys' fees and costs associated with the Debtors' appeals and bankruptcy cases." *Id.* ¶ 61 (emphasis added). | |

Furthermore, as previously discussed, Le has represented that Huynh, acting as the Debtor, has opted not to assert a valid statute of limitations defense against the Le Claim in order to help her son recover a substantial disputed claim at the expense of non-insider Creditors.

### IV.
### THE "OTHER DEFECTS" ALLEGED IN THE OBJECTIONS LACK MERIT

**A.     The Exculpation Provision is Proper and Consistent With Ninth Circuit Authority Because It Is Narrowly Tailored to Pre-Effective Date Claims Related to the Plan and the Chapter 11 Cases, It Contains Appropriate Carveouts, and It Is Appropriate Given the Substantial Consideration to be Paid by the Plan Proponents.**

The Debtors' Objection argues that the Exculpation Provision constitutes an impermissible non-debtor release in violation of Section 524(e) and Ninth Circuit authority such as *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), *Underhill v. Royal*, 769 F.2d 1426 (9th Cir. 1985), and *American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.)*, 885 F.2d 621 (9th Cir. 1989). *See* Debtors' Obj. at 5:11-10:14. The Debtors' Objection does not cite or object to any particular language in the Exculpation Provision. Instead, it argues broadly that "[c]lauses such as these seeking to limit liability are generally disfavored by courts in the Ninth Circuit." *Id.* at 7:25-8:2 (citing *In re Metricom, Inc.,* 275 B.R. 364 (Bankr. N.D. Cal. 2002), and *In re WCI Cable, Inc.,* 282 B.R. 457, 479 (Bankr. D. Or. 2002)).

The Exculpation Provision states:

The NV Creditors and the Judgment Creditors or (as applicable) any of their respective current members, partners, officers, directors, employees, advisors, professionals, representatives or agents and advisors of any of the foregoing (including any attorneys, financial advisors, accountants, and other professionals retained by such entities), but solely in their capacities as such, shall be Exculpated Parties. None of the Exculpated Parties shall have or incur any liability to any Holder of any Claim or Equity Interest or any other Person for any act or omission that occurred or allegedly should have occurred **on or before the Effective Date in connection with, related to, or arising out of the Chapter 11 Case, the negotiation, execution, proposal and sponsorship of the Plan, the Disclosure Statement, the solicitation of votes on the Plan, seeking the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, and the property to be distributed under the Plan**, including all documents ancillary thereto, all decisions, actions, inactions and alleged

negligence or misconduct relating thereto and all activities leading to the promulgation and Confirmation of the Plan **except in case of fraud, willful misconduct, intentional misconduct, or gross negligence** by such Exculpated Party as determined by a Final Order.

Plan § XI.D (at pp. 20-21) (emphasis added).

This Court recently approved a similar provision in *In re Mega RV Corp.*, Case No. 8:14-bk-13770-MW (Bankr. C.D. Cal. Aug. 4, 2015) ("***Mega RV Docket***"), as to the debtor, the creditors committee and their professionals and representatives:

> **Except to the extent arising from willful misconduct or gross negligence**, any and all Claims, liabilities, Causes of Action, rights, damages, costs, and obligations held by any party against the Debtor, the Committee, and their respective attorneys, accountants, agents, and other Professionals, and their officers, directors, members, and employees, whether known or unknown, matured or contingent, liquidated or unliquidated, existing, arising, or accruing, whether or not yet due in any manner **related to the post-Petition Date administration of the Case or the formulation, negotiation, prosecution, or implementation of the Plan**, shall be deemed fully waived, barred, released, and discharged in all respects, except as to rights, obligations, duties, claims, and responsibilities preserved, created, or established by the terms of the Plan. Pursuant to section 1125(e) of the Bankruptcy Code, the Debtor and the Committee and their present and former members, officers, directors, employees, agents, advisors, representatives, successors or assigns, and any Professionals (acting in such capacity) employed by any of the foregoing entities will neither have nor incur any liability to any Person for their role in soliciting acceptances or rejections of the Plan.

Mega RV Dkt. No. 691 (Second Amended Plan) § 7.2; *see also* Mega RV Dkt. No. 739 (Order confirming Second Amended Plan and expressly approving the exculpation provision "to the maximum extent permitted by law"); *In re Western Asbestos Co.*, 313 B.R. 832 (Bankr. N.D. Cal. 2003) (approving a similar exculpation provision as to the debtors, the creditors' committee and the debtors' future representatives, notwithstanding the same argument made in the Debtors' Objection (based on the same authority) that "the Ninth Circuit views such provisions with disfavor").

That the Plan Proponents are individual creditors rather than a creditors committee is of no moment. *See In re Lighthouse Lodge, LLC*, 2010 Bankr. LEXIS 3663, at *20 (Bankr. N.D. Cal. Oct. 14, 2010) ("The release provision at issue is similar to those that insulate a creditor's committee from liability in a chapter 11 plan, which is a good starting point for our analysis. . . . . [A] plan may contain a release provision insulating a committee and its members from liability except from gross negligence or willful misconduct. . . . This release of liability except from gross negligence or willful misconduct has been extended to plan proponents other than a committee."). And, the Plan

Proponents are already protected under Section 1125(e) in connection with the solicitation of acceptance of the Plan. *See* 11 U.S.C. § 1125(e).

To the extent the Exculpation Provision exceeds the protection already granted under Section 1125(e), it is consistent with Ninth Circuit authority and appropriate because it is narrowly tailored to pre-Effective Date matters related to the Chapter 11 Cases and the Plan. In *In re Plant Insulation Co.*, 2012 Bankr. LEXIS 1716 (Bankr. N.D. Cal. Mar. 15, 2012), for example, the bankruptcy court approved an exculpation clause as to various non-debtor parties because it was "appropriately-tailored" and "contain[ed] customary and appropriate carveouts for gross negligence and willful misconduct." *Id*. at *57. The court noted that it had presided over the chapter 11 case since its commencement, which gave the court "substantial opportunities to consider the conduct of all of the parties that would be exculpated under section 8.6.1 of the Plan," and it concluded that "[t]his court has found nothing that would indicate that their conduct since the Petition Date has been inappropriate or wrongful such that they should not benefit from the exculpation clause of section 8.6.1." *Id*. at *57-58. Notably, the court rejected the Debtors' argument pertaining to *Lowenschuss* and *American Hardwoods*:

> The Non-Settling Insurers contend that section 8.6.1 cannot be approved because it contradicts section 524(e) of the Bankruptcy Code and is inconsistent with the Ninth Circuit rulings in *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995), and *In re American Hardwoods Inc.*, 885 F.2d 621 (9th Cir. 1989). **The court concludes that where an exculpation clause is limited to post-petition conduct relating to conduct occurring within a bankruptcy case, neither section 524(e) of the Bankruptcy Code nor the Ninth Circuit law cited by the Non-Settling Insurers is relevant because those limits apply to third-party releases of claims based on prepetition conduct.** A post-petition exculpation clause may be approved where it is limited to the Debtor, the Committee, the Futures Representative, and certain third parties and their respective agents, as long as it contains an exception for bad faith, gross negligence, and willful misconduct. *See In re Western Asbestos Co.*, 313 B.R. 832, 846-47 (Bankr. N.D. Cal. 2003); *In re Lighthouse Lodge, LLC*, 2010 Bankr. LEXIS 3663, 2010 WL 4053984, at *6-9 (Bankr. N.D. Cal. Oct. 14, 2010).

*Id*. at *58-59 (emphasis added).

Similarly, the court in *In re BLX Group Inc.*, 2011 Bankr. LEXIS 4505 (Bankr. D. Mont. Nov. 22, 2011), held that *Lowenschuss*, *American Hardwoods*, and *Underhill* were "inapplicable" to the exculpation clause there because it was "not a broad sweeping provision that seeks to discharge or release nondebtors from any and all claims that belong to others," and it was "narrow in both scope

and time, and applies only to an 'act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of this Plan, the solicitation of acceptances of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan[.]'" *Id.* at *16-17.  Rejecting an objecting party's argument that he "will have substantial claims against exculpated parties based on their willful and malicious prosecution of frivolous claims against him," the court reasoned that "[s]uch claims are not barred by the exculpation clause because the exculpation clause, by its plain terms, does not protect any party, beyond a quasi-judicial immunity defense, 'for acts or omissions which are the result of fraud, breach of fiduciary duties, gross negligence, or willful misconduct.'" *Id.* at *17-18.

As in the foregoing authority, the Exculpation Provision is narrowly tailored to claims related to the Chapter 11 Case and the Plan, and it contains appropriate carveouts for fraud, willful misconduct, intentional misconduct, or gross negligence.  The Exculpation Provision is *not* a broad non-debtor release of claims unrelated to this bankruptcy case.

The circumstances of this case further highlight the fairness of the Exculpation Provision. The NV Creditors expended significant resources to design, orchestrate and fund a viable Plan that would pay all Allowed General Unsecured Claims and all Allowed Administrative Expense Claims in full in cash.  There is simply no reason for such parties to retain any claims against the Plan Proponents that are not already carved out of the Exculpation Provision.  Though the insiders clearly find the Plan objectionable, their recourse is properly limited to appealing Confirmation of the Plan. The Plan Proponents also expect that the Court would agree it has "found nothing that would indicate that their conduct since the Petition Date has been inappropriate or wrongful such that they should not benefit from the exculpation clause." *In re Plant Insulation Co.*, 2012 Bankr. LEXIS 1716, at *57-58.  Accordingly, the Plan Proponents respectfully submit that the Exculpation Provision is (a) fair and equitable, supported by consideration, in the best interests of the Debtor and all parties in interest, and necessary to the realization of the value provided by the Plan for Creditors, and (b) consistent with the applicable provisions of the Bankruptcy Code and authorized under Section

105(a) of the Bankruptcy Code, the equitable powers of this Court, and the applicable case law in this Circuit.

The Debtors' Objection also argues that the Plan improperly "seeks to limit the liability of the Disbursing Agent [the Reorganized Debtor under the Plan] to only willful misconduct." Debtors' Obj. at 9:18-10:14. This objection fails to cite any objectionable language and it is unclear what provision of the Plan the Debtors find objectionable. Moreover, the Debtors lack standing to raise this objection because Huynh will not receive any payments under the Plan and the Debtor lacks a sufficient interest in the standard of liability attached to post-Effective Date payments to Creditors.

**B.    Preserved Right to Pursue Discovery Under Rule 2004**

The Le/Holliday Objection argues that the Plan should not retain "fishing expedition" rights for the Reorganized Debtor post-Confirmation. Le/Holliday Obj. at 20:16-24. It does not cite any authority for the proposition that Rule 2004 discovery is not permitted post-confirmation. Indeed, it is. *See In re VOX II, LLC*, 2008 Bankr. LEXIS 556, at *1-2, *5 (Bankr. D. Md. Mar. 4, 2008) ("'The language of Rule 2004(b) allows, in a narrow context, the use of a rule 2004 examination post-confirmation'. . . . Discovery under Rule 2004 is far broader than discovery under the Federal Rules of Civil Procedure and is often described as being in the nature of a fishing expedition.") (quoting *In re Express One International, Inc.,* 217 B.R. 215, 216-17 (BC E.D. Tex. 1998)). Le and Holliday are understandably concerned about the prospect of Rule 2004 discovery considering the record in this case contains numerous examples of reversed sworn testimony and evidence of the insiders' questionable dealings with the Debtor, which only underscores the importance of preserving the Reorganized Debtor's ability to, for example, identify and locate Assets belonging to the Reorganized Debtor. Le and Holliday can, of course, object to such discovery if and when it is sought.

**C.    Definition of "Substantial Consummation"**

The Le/Holliday Objection argues that the definition of "substantial consummation" ignores "the transfer of assets under subpart (A) and the assumption of property under subpart (B)" of Section 1101(2), and that it is improper to "identif[y] the point of substantial consummation as occurring when only Administrative Expense and Non-Tax Priority Claims have been paid" because other payments will remain to be made at that point. Le/Holliday Obj. at 20:16-24. Le and Holliday lack

standing to raise this objection because Le will not receive any payments under the Plan and thus the issue of substantial consummation does not affect him, and Holliday (who will seek Administrative Expense Claims) lacks standing to object on behalf of parties that might remain to be paid after his Administrative Expense Claims have been paid.

In any event, the definition of "substantial consummation" is proper because the reissued stock of the Reorganized Debtor is the primary property "dealt with by the plan," and, on the Effective Date, all Assets of the Debtor will revest in the Reorganized Debtor pursuant to § VII.J of the Plan and the stock of the Reorganized Debtor will be issued in the manner set forth in Exhibit B to the Plan. Hence, the "transfer of all or substantially all of the property proposed by the plan to be transferred" and the "assumption by the . . . successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan" will have occurred. *See* 11 U.S.C. § 1101(2)(A)-(B). Upon the payment of Allowed Administrative Expense Claims and Allowed Administrative Priority-Non-Tax Claims (or the placement of sufficient funds in a segregated reserve), distributions under the Plan will have "commence[d]" pursuant to Section 1101(2)(C), and each of the steps for substantial consummation under Section 1101(2) will have been occurred.

## D. Affiliations of the Officers and Directors of the Reorganized Debtor

The Le/Holliday Objection acknowledges that the Plan "identif[ies] the initial officers and directors of the Reorganized Debtor," but argues that it fails to adequately discuss those individuals' *affiliations* and whether their appointment is consistent with the interests of creditors, equity holders and the public. Le/Holliday Obj. at 22:4-25. Le and Holliday lack standing to raise this objection (or any perceived injustice *to Huynh*) because it cannot conceivably affect them. The scope of their interests is limited to the treatment of their Claims, if any, under the Plan. Neither individual will have any affiliation with the Reorganized Debtor, and the payments under the Plan will not depend upon the Reorganized Debtor's success (or its officers and directors).

In any event, the Plan **does** disclose the affiliations of each of the individuals designated as initial officers and directors of the Reorganized Debtor. *See* Plan, § IV.E, Exh. C. Moreover, if the Court recharacterizes or subordinates the Insider Claims and determines that the Plan satisfies the

"best interests test," the Plan will necessarily be "consistent with the interests of creditors and equity security holders." And, especially considering that the payments under the Plan do not depend on the Reorganized Debtor's success, the Plan Proponents have submitted the Plan in good faith and the Plan is supported by substantial consideration, there is simply no basis upon which to conclude that the designation of such individuals is not in the best interests of creditors or the public.

## V.
## CONCLUSION

**WHEREFORE**, for the reasons set forth above, the Plan Proponents respectfully request that this Court enter an Order confirming the Plan and grant such other and further relief that this Court deems necessary and appropriate.

Dated: January 27, 2016

HOYT E. HART II

CRAIG H. MILLET
DOUGLAS LEVIN
GIBSON, DUNN & CRUTCHER LLP

By:   /s/ Douglas G. Levin
       Douglas G. Levin

Attorneys for Plan Proponents the NV Creditors

102046849.1

# Attachment A



FOCUS - 4 of 4 DOCUMENTS

**FRED and JOYCE HAMEETMAN, Plaintiffs and Appellants, v. CALIFORNIA FRANCHISE TAX BOARD, Defendant and Respondent.**

**B187278**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION SEVEN**

**2006 Cal. App. Unpub. LEXIS 11132**

**December 11, 2006, Filed**

**NOTICE:** [*1] NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBIT COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County, No. BC 305968. Mary Ann Murphy, Judge.

**DISPOSITION:** Affirmed.

**COUNSEL:** Gibbs, Giden, Locher & Turner and Eric L. Troff for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, W. Dean Freeman, Lead Supervising Deputy Attorney General, and Donald R. Currier, Deputy Attorney General, for Defendant and Respondent.

**JUDGES:** WOODS, J.; JOHNSON, Acting P.J., ZELON, J. concurred.

**OPINION BY:** WOODS

**OPINION**

Plaintiffs Fred and Joyce Hameetman [1] appeal from the judgment in favor of defendant California Franchise Tax Board ("FTB") in their action for a tax refund. Plaintiffs contend they were entitled to a deduction for a bad business debt based on money Joyce advanced to her limited partner-

2006 Cal. App. Unpub. LEXIS 11132, *

ship for loan to a third party because the intent of the parties was the transaction was to be a loan from her to the third **[*2]** party. We affirm.

1    When necessary to identify an individual appellant, he or she is referred to by his or her first name.

## FACTUAL AND PROCEDURAL SYNOPSIS

In 1984, Joyce and Fred were limited partners owning 99 percent of Muir Partners ("Partnership"), a California limited partnership. The remaining one percent was owned by Cal American Management Corporation ("Cal American"), a California corporation, which was the general partner of the Partnership. Cal American was owned entirely by Fred.

The business of the Partnership was "to purchase, hold, develop, improve, lease, hypothecate and/or sell" an apartment building (the "Property") located in San Francisco. The Property was the only asset of the Partnership.

The Property had been purchased from Traweek Investment Fund # 10 (the "Fund") by Cal American in 1984. ² The managing partner of the Fund was Richard Traweek, who held a 20 percent interest in the Fund. The Property was purchased for $ 38,000,000, consisting of an all inclusive note which **[*3]** contained three separate notes for: (1) $ 19.2 million, (2) $ 5,802,750, which represented the existing indebtedness of the seller and which was secured by first and second trust deeds; and (3) $ 13 million, which represented the seller's equity. The all inclusive note was secured by a third trust deed against the Property.

2    The stipulated facts stated the Property was purchased by Cal American; in Joyce's declaration, she stated the Partnership purchased the Property.

In 1986, Cal American transferred the Property to the Partnership and was replaced as the general partner of the Partnership by the John Muir Corporation (the "Corporation"), a California corporation. Joyce was the president, secretary, treasurer and sole shareholder of the Corporation. As of 1986, Joyce was the sole limited partner owning 99 percent of the Partnership and the sole shareholder of the Corporation which owned one percent of the Partnership and was its general partner. Fred had no interest in the Partnership as of 1986.

Sometime **[*4]** in 1986, the Partnership sought to refinance the debt on the Property in order to obtain a lower interest rate which would have made the Partnership more profitable as the refinancing was projected to save the Partnership approximately $ 1 million a year in interest payments. The refinancing required the consent of the Fund as holder of the all inclusive note. As managing partner of the Fund, Traweek agreed to consent to the refinancing by signing a subordination agreement only if he received a personal loan from the Partnership in the amount of $ 857,336.

In order to fund the loan to Traweek, Joyce transferred personal funds in the amount of $ 857,336 into an escrow account in the name of the Partnership which then loaned the money to Traweek in the form of a disbursement from the escrow account in exchange for the signed subordination agreement and a promissory note (the "Note") in favor of the Partnership. The Note was secured by an assignment to the Partnership of Traweek's 20 percent interest in the Fund. The Partnership then assigned the Note to Joyce "[a]s security" for the money she advanced and funded to the Partnership.

The assignment was made for the purpose of expediency **[\*5]** to avoid the delay of Traweek paying the Partnership and then the Partnership paying Joyce, i.e., as the treasurer of the Partnership's general partner, Joyce would have had to write checks to herself.

Pursuant to the assignment, Traweek made payments on the Note directly to Joyce until June 1987 when he filed for bankruptcy. The Partnership was a creditor in the bankruptcy. Near the end of 1987, Traweek reached an agreement with Security Pacific National Bank ("Security Pacific"), his principal creditor, to liquidate his assets in order to repay Security Pacific. Traweek dismissed his bankruptcy without receiving a discharge of his debts. Traweek resumed making payments to Joyce until mid-1990. By the middle of 1990, Security Pacific had liquidated Traweek's assets, including his 20 percent interest in the Fund, leaving Traweek insolvent, without assets and unable to repay the Note. All of the payments made by Traweek on the Note were applied to interest only.

At no time after the loan to Traweek was Joyce's capital account in the Partnership increased. [3] The limited partnership agreement did not require Joyce to make any additional capital contribution. Similarly, at no time after **[\*6]** the Note was assigned to Joyce did the books and records of the Partnership reflect any distribution to Joyce.

> 3    According to the Partnership agreement each partner's capital contribution was set forth in exhibit A, which was attached to the agreement. Exhibit A states the capital contribution of Fred and Joyce was "100" and of Cal-American was "0." It is not clear if that was a dollar amount or a percentage.

In their 1990 joint personal income tax return, appellants deducted as an ordinary loss, business bad debt the loan amount of $ 857,336. Because the deduction created a net operating loss ("NOL") carryover, the NOL was used on appellants' 1993 joint return. The FTB audited appellants' 1990 California return and made a determination that the alleged bad debt was incurred to protect Joyce's investment in the Partnership and was therefore a (capital loss) nonbusiness bad debt. Based upon that determination, the FTB issued notices of proposed assessment for the years at issue.

Appellants appealed the decision **[\*7]** to the State Board of Equalization ("SBE"). The SBE sustained the FTB's determination, finding that the transfer of funds from Joyce to the Partnership was an investment transaction rather than a loan and that because Joyce was a limited partner in a limited partnership, the bad debt had not been acquired by her while engaged in the trade or business of the Partnership. The SBE also determined that although the debt could be considered a bad business debt in the hands of the Partnership, it was not a bad debt as to Joyce.

Appellants paid the disputed tax and interest for tax years 1990 and 1993 (approximately $ 142,429) and filed a claim for refund on the grounds that Joyce's advancement of funds to the Partnership was related to the business of the Partnership and that the business of the Partnership must be imputed to Joyce as a limited partner. The claim was denied by the FTB. Appellants then filed the instant refund action.

After a trial on stipulated facts, the court ruled Joyce's advancement of funds was a capital contribution not a loan, the assignment of the Note as security for the advance of funds did not give rise to a business bad debt as to her, Joyce did not loan money **[\*8]** directly to Traweek and Joyce was not engaged in the business of the Partnership. The court entered judgment in favor of the FTB.

Appellants filed a timely notice of appeal from the judgment. [4]

2006 Cal. App. Unpub. LEXIS 11132, *

4    Appellants failed to include in their appendix a copy of their notice of appeal as required by California Rules of Court, rules 5.1(b) and 5(b).

## DISCUSSION

The instant case was tried to the court on stipulated facts. The application of tax statutes to undisputed facts is reviewed de novo. (*Brown Group Retail, Inc. v. Franchise Tax Bd.* (1996) 44 Cal.App.4th 823, 829.)

## I. Capital Contribution

Appellants contend that because the subject loan was made for a valid business purpose, pursuant to Internal Revenue Code section [5] 166, they were entitled to take a deduction for a bad business loan when the loan became worthless. Respondent contends the money Joyce advanced to the Partnership was a nondeductible capital contribution or **[*9]**   a nonbusiness bad debt.

5    Unless otherwise noted, all statutory references are to the Internal Revenue Code (found in 26 U.S.C.).

Appellants argue that it is clear from the undisputed evidence looked at as a whole, the subject transaction was intended to be a loan from Joyce to Traweek. [6] (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 967 ["Several documents concerning the same subject and made part of the same transaction will be construed together even if the documents were not executed contemporaneously."].)

6    According to appellants, although the subordination agreement, preliminary escrow instructions, promissory note and assignment were not executed at the same time, they were part and parcel of one overall transaction designed to refinance the Property.

In *Adelson v. United States* (Fed.Cir. 1984) 737 F.2d 1569, **[*10]**   the taxpayer, a financial consultant, argued he was entitled to deduct as additions to bad debt reserves, funds advanced by him to his clients to fund growth of his clients' companies. One of the issues addressed by the court was whether the advances made by the taxpayer were bona fide debts. [7] The court reasoned: "Only a 'bona fide debt' qualifies for a deduction under I.R.C. § 166. A 'bona fide debt' is defined as 'a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money.' Contributions to capital are specifically excluded from I.R.C. § 166." (Citation omitted.) (*Id.*, at p. 1571.) The court distinguished between a loan and risk capital, "a loan is made upon the reasonable assumption that it will be repaid no matter whether the business venture is successful or not, while capital is put to the risk of the business." (*Ibid.*) The court further noted, "'[t]he real differences [between a debt and a capital contribution] lie in the debt-creating intention of the parties, and the genuineness of repayment prospects in the light of **[*11]**   economic realities.'" (*Ibid.*)

7    In *Adelson*, there was no issue as to whether the taxpayer was engaged in the trade or business of the partnership. (*Adelson v. United States*, *supra*, 737 F.2d at p. 1571.)

The question of whether an advance is debt or equity is "'primarily directed at ascertaining the intent of the parties,'" a determination which is a question of fact which once resolved by the trial court, cannot be overturned unless clearly erroneous. (*Bauer v. C.I.R.* (9th Cir. 1985) 748 F.2d

2006 Cal. App. Unpub. LEXIS 11132, *

1365, 1367.) The SBE and the superior court determined the funds advanced to the Partnership were capital contributions.

In *Gilbert v. Commissioner of Internal Revenue* (2d Cir. 1957) 248 F.2d 399, 406, the court noted that numerous cases had denied deductions to taxpayers when advances "were made under such circumstances as to negative any reasonable expectation of repayment." It is apparent that Joyce did not expect repayment by the Partnership. There was **[*12]** no certificate evidencing any indebtedness by the Partnership, no maturity date for repayment by the Partnership, the repayment was to be made by a third party (via the assignment of the Note as security), there was no right to enforce payment from the Partnership, and as a limited partner, Joyce had no right to participate in the management of the Partnership. (See factors discussed in *Hardman v. U.S.* (9th Cir. 1987) 827 F.2d 1409, 1412; see also *Hambuechen v. Commissioner* (1964) 43 T.C. 90, 102 ["[W]here it becomes necessary, for tax purposes, to determine whether an advance by a partner to his partnership was in fact a loan, a determination of this question will be based upon all the facts and circumstances surrounding the transaction."].)

Joyce was the sole limited partner owning 99 percent of the Partnership and the sole shareholder of the Corporation which owned one percent of the Partnership and was its general partner. (Cf. *Adelson v. United States*, *supra*, 737 F.2d at p. 1573 ["In a case in which there is a complete identity of ownership between the creditor and the debtor, there is a far greater likelihood that the **[*13]** purported loan is actually a disguised capital contribution, as this arrangement would permit a 100-percent shareholder to obtain certain tax advantages, such as an ordinary loss under [§ 166] if the debt became worthless, . . ."].)

Appellants assert the substance of taxable transaction and not its form controls. (See e.g. *General Motors Corp. v. Franchise Tax Bd*. (2006) 39 Cal.4th 773, 783-784 and cases cited therein ["in deciding transaction's tax treatment, court should look to transaction's economic reality"].) According to appellants, the intent was to prearrange for Traweek to repay Joyce directly. However, the reason Traweek was to repay Joyce directly was for the purpose of expediency so she would not have to write checks to herself. The fact Joyce intended to ignore the Partnership does not mean she could do so. If she wanted to loan money to Traweek, she could have done so directly.

Appellants argue the lack of a formal loan agreement between Joyce and Traweek is of no consequence and complain the court focused on only one leg of the transaction -- Joyce's advance of money to the Partnership. That leg was a key component of the transaction. We need **[*14]** not decide if the money Joyce advanced to the Partnership was intended to be a loan or a capital contribution, but note if the advance was a capital contribution, it cannot be claimed as a bad business debt, and, if a loan, the money is owed by the Partnership. Instead, we will address whether Traweek's failure to repay the loan was a bad business debt as to Joyce.

## II. Bad Business Debt

California Revenue and Taxation Code, which contains no provisions for how limited partners and limited partnerships are to be taxed, provides in section 17851 that: "Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code, relating to partners and partnerships, shall apply, except as otherwise provided."

To deduct a bad business debt, section 166 states:

2006 Cal. App. Unpub. LEXIS 11132, *

"(a) General rule.-

"(1) Wholly worthless debts.-There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

". . . .

"(d) Nonbusiness debts.-

"(1) General rule.-In the case of a taxpayer other than a corporation-

"(A) subsection (a) shall not apply to any nonbusiness debt; and

". . . .

"(2) Nonbusiness debt defined.-For purposes of paragraph **[*15]**   (1), the term 'nonbusiness debt' means a debt other than-

"(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

"(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business."

"In order to establish entitlement to deductions and credits, taxpayers have the burden of proving that they meet the statutory requisites." (*Booker v. Commissioner* (1996) T.C. Memo 1996-261; *Krumpotich v. Franchise Tax Bd.* (1994) 26 Cal.App.4th 1667, 1671 [same].)

Under section 166, in order to claim a deduction for a bad business debt, the taxpayer must establish "(1) that he is engaged in a trade or business, and (2) that the bad debt loss is proximately related to the conduct of that trade or business." (*Harsha v. U. S.* (10th Cir. 1979) 590 F.2d 884, 886; see also *Levin v. United States* (Ct.Cl. 1979) 220 Ct. Cl. 197, 597 F.2d 760, 764.) Citing *Harsha*, appellants argue the loan to Traweek was made in connection with the Partnership's business. The SBE found Traweek's failure to repay the loan was a bad business debt as to the **[*16]** Partnership. The loss was proximately related to the business of the Partnership as Joyce advanced the funds in order to refinance the Property and increase the profitability of the Partnership by saving on interest payments. (See *Harsha*, at p. 887.) However, the SBE also found the loan was not a bad business debt as to Joyce because she was not engaged in the business or trade of the Partnership.

2006 Cal. App. Unpub. LEXIS 11132, *

Joyce was a limited partner. (See *Gregg v. U.S.* (D.Or. 2000) 186 F. Supp. 2d 1123, 1128 ["'[A] limited partner generally is precluded from participating in the partnership's business if he is to retain his limited liability status.'"]; *Wyler v. Feuer* (1978) 85 Cal.App.3d 392, 402, 149 Cal. Rptr. 626 ["A limited partnership affords a vehicle for capital investment whereby the limited partner restricts his liability to the amount of his investment in return for surrender of any right to manage and control the partnership."].) The Partnership agreement provided the limited partner "shall have no power or authority to manage the partnership business, or transact business on behalf of or in the name of the Partnership, or bind or obligate the Partnership. **[*17]**    "

"For a taxpayer to be carrying on a trade or business, the 'taxpayer must be involved in the activity with continuity and regularity . . . .'" (*Wood v. Commissioner of Internal Revenue* (2005) 138 Fed.Appx. 168, 172.) Appellants' tax return listed Joyce's occupation as a housewife. Appellants do not claim Joyce was herself engaged in the business of managing the Property; rather their claim is that the business of the Partnership must be imputed to Joyce.

Moreover, appellants claim that as assignee of the Note, Joyce stands in the shoes of the Partnership and can deduct the bad business debt. (*American-LaFrance-Foamite Corporation v. C. I. R.* (2d Cir. 1960) 284 F.2d 723, 724 [In determining whether advances were contributions or loans, "it is said that 'the intention of the parties is a major factor in determining the true nature of the relationship,'" but even though "[t]he 'substance' rather than the 'form' of the transaction has frequently been stressed. In the final analysis, it is from that composite of all the facts that an attempt must be made to create a probably non-existent intent . . . ." (Citations omitted; emphasis deleted.)].) Appellants **[*18]**    argue that as assignee, Joyce acquired the right to repayment which created a debtor-or-creditor relationship between Joyce and Traweek. (*Professional Collection Consultants v. Hanada* (1997) 53 Cal.App.4th 1016, 1018-1019 ["An assignee stands in shoes of the assignor, acquiring all of its rights and liabilities."].)

Citing section 702, appellants claim the character of the loan did not change when it was assigned to Joyce, i.e., it was a business loan from her to Traweek. Section 702(b) provides: "The character of any item of income, gain, loss, deduction, or credit included in a partner's distributive share under paragraphs (1) through (7) of subsection (a) shall be determined as if such item were realized directly from the source from which realized by the partnership, or incurred in the same manner as incurred by the partnership."

Appellants did not deduct the bad business debt as an item from the Partnership's distributive share but rather it was deducted as an item of personal loss. Even though appellants note that the losses from debts are treated differently from other losses in that the relevant provisions are mutually exclusive (see *Spring City Co. v. Commissioner* (1934) 292 U.S. 182, 189, 78 L. Ed. 1200), **[*19]**    neither party discusses what the effect would have been if the bad business debt had been deducted by appellants as a partnership loss. (See discussion in Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2006) § 2:89-2:97 ["[P]artnership losses are 'passed through' to the partners, and may be utilized to reduce other taxable income, subject to basis limitations, 'at risk' loss limitations and 'passive activity' loss limitations." (Emphasis deleted.)].) [8]

---

8    In its decision, the SBE stated that if the Partnership had retained the loan rather than distributing it, the subsequent loss would have passed through to appellants as a passive activity loss not as an ordinary business loss.

Appellant insist their right to take a business deduction for bad business debt is recognized by controlling tax law and cite *Harding v. United States* (Ct.Cl. 1953) 125 Ct. Cl. 585, 113 F. Supp. 461 and *S.E. Maitland Brenhouse v. Commissioner of Internal Revenue* (1961) 37 T.C. 326. **[*20]** In *Harding*, the plaintiff, a broker, approached a broker with another firm and agreed to loan him the money necessary to purchase a seat on the New York stock exchange to handle the business of the plaintiff's partnership. The court reasoned: "Plaintiff's business was a brokerage business carried on through the instrumentality of the brokerage firm of Chas. D. Barney & Company and its successor Smith, Barney & Company. Plaintiff borrowed the money in order to promote the business of this partnership, and, therefore, his own business, and it would, therefore, seem plain that the loss sustained by plaintiff on account of this bad debt was a loss attributable to the carrying on of his business through the instrumentality of the brokerage firm." (*Harding*, at p. 463.) However, the court noted the plaintiff would not be entitled to the deduction for a bad debt if it was "'not attributable to the operation of a trade or business regularly carried on' by him." (*Ibid*.)

In *Maitland*, the petitioner Martin Kornbluth formed a partnership, the business of which was the design and display of point-of-sale displays. Kornbluth was the sales manager of the partnership, and it was his responsibility **[*21]** to promote the product of the business. When there was not enough business, Kornbluth advanced moneys to another company to introduce him to display buyers. Kornbluth never received repayment of the moneys. The court determined the debt was a bad business debt as the only reason for its existence was a proximate relation to the business of Kornbluth's partnership. *(S.E. Maitland Brenhouse v. Commissioner of Internal Revenue, supra*, 37 T.C. at p. 330.)

These cases beg the question of whether Joyce's business was the business of the Partnership. Unlike the plaintiffs in *Harding* and *Maitland*, Joyce was not personally in the business of managing property, she was not a general or managing partner, and she did not advance money to the third party, but to the Partnership.

Appellants contend the business of a partnership is imputed to the limited partners. As support, appellants cite *Valentino v. Franchise Tax Bd.* (2001) 87 Cal.App.4th 1284, 1291, in which the court applied section 875, which provides a nonresident alien is considered to be engaged in a trade or business in the United States where a limited partnership of which the person is **[*22]** a member is so engaged. Appellants reason that if a nonresident alien is considered to be engaged in the business of a partnership then a United States citizen should also be considered to be engaged in the trade or business of his or her partnership. However, appellants cite no federal or state statute similar to section 875 providing so.

As further support that because partnerships are pass-through entities, the business of the partnership is imputed to the limited partners for tax purposes, appellants cite *Stanchfield v. Commissioner of Internal Revenue* (1965) T.C. Memo 1965-305 and *Butler v. Commissioner of Internal Revenue* (1961) 36 T.C. 1097. In *Stanchfield*, the tax court noted that even though the trade or business of a corporation was distinct from its stockholders, "we do not believe a similar distinction can be made in the case of a partnership and its partners." However, there was no issue as to whether the taxpayer was engaged in the business of the joint venture (not a partnership).

In *Butler*, the court reasoned: "Whether a taxpayer's activities constitute the carrying on of a trade or business so that bad debts proximately related **[*23]** thereto may be deducted in full is essentially a question of fact, requiring an examination of the particular facts in each case." (*Butler v. Commissioner of Internal Revenue, supra,* 36 T.C. at p. 1106.) Although the court also observed

2006 Cal. App. Unpub. LEXIS 11132, *

that "[b]y reason of being a partner in a business petitioner was individually engaged in business," (*ibid*.) unlike the instant case, the court noted it had not been urged to make any distinction between ordinary and limited partners. (*Id*., at p. 1105.)

Citing several treatises, *Whipple v. Commissioner* (1963) 373 U.S. 193, and *United States v. Generes* (1972) 405 U.S. 93, 31 L. Ed. 2d 62, the SBE distinguished *Butler* and concluded that as a limited partner Joyce was more like a shareholder because her rewards did not flow "from personal effort, but from earnings and appreciation" so she did not acquire the debt in question "while engaged in the trade or business of the Partnership." We find the SBE's reasoning persuasive.

None of the cases cited by appellants involved a "loan" by a limited partner, not to the partnership, but to a third party via the instrumentality of the **[*24]**   limited partnership. The Note established the loan was made by the Partnership to Traweek; only the Partnership was listed as a creditor in Traweek's bankruptcy. "It is settled that taxpayers must normally accept the tax consequences of the way in which they deliberately choose to cast their transactions." (*Lareau v. U.S.* (Ct.Cl. 1978) 78-2 USTC 86045, 86049.) "Generally, where a taxpayer seeks to impugn his own transaction for his own tax benefit, the courts will not pay heed except in extraordinary circumstances." (*Id*., at p. 86051.) "As a general rule, the government may indeed bind a taxpayer to the form in which he has factually cast a transaction. The rule exists because to permit a taxpayer at will to challenge his own forms in favor of what he subsequently asserts to be true 'substance' would encourage post-transactional tax-planning and unwarranted litigation on the part of many taxpayers and raise a monumental administrative burden and substantial problems of proof on the part of the government." (Citations omitted.) (*In re Steen* (9th Cir. 1975) 509 F.2d 1398, 1402, fn. 4; see also *Commissioner v. Nat. Alfalfa Dehydrating* (1974) 417 U.S. 134, 149, 40 L. Ed. 2d 717 **[*25]** ["[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." (Citations omitted.)].)

Appellants argue that the business of the Partnership should be imputed to Joyce while urging that the Partnership was a pass-through entity. In other words, appellants want to ignore the fact the Partnership loaned the money to Traweek, but take advantage of the Partnership by imputing its business to Joyce. We hold that the assignment of the Note to Joyce did not trump the form used and agree with the SBE and the FTB that the default on the loan was not a bad debt as to Joyce.

## DISPOSITION

The judgment is affirmed. Respondent to recover costs on appeal.

WOODS, J.

We concur:

JOHNSON, Acting P.J.

ZELON, J.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:**3161 Michelson Drive, Irvine, CA  92612-4412**

A true and correct copy of the foregoing document entitled (*specify*):  REPLY IN SUPPORT OF CONFIRMATION OF THE NV CREDITORS' CHAPTER 11 PLAN OF REORGANIZATION FOR DEBTOR LITTLE SAIGON NEWS DATED SEPTEMBER 29, 2015 will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On January 27, 2016, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses indicated below:

- Sandor T Boxer    tedb@tedboxer.com
- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- Ann K Johnston    ajohnston@bergerkahn.com, mtom@bergerkahn.com,tsmith@bergerkahn.com
- Michael Jones    mike@mjthelawyer.com, michaeljonesmyecfmail@gmail.com
- Douglas G Levin    DLevin@gibsondunn.com
- Tuananh Mai    pmai@tt-lawfirm.com
- Craig Millet    cmillet@gibsondunn.com, pcrawford@gibsondunn.com;cmillet@gibsondunn.com
- John Na    jna@tt-lawfirm.com
- R G Pagter    gibson@ppilawyers.com, ecf@ppilawyers.com
- Leonard Pena    lpena@penalaw.com, penasomaecf@gmail.com
- Frederick S Reisz    reisz@mmrs-law.com, chun@mmrs-law.com,greene@mmrs-law.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- David R. Weinstein    dweinstein@weinsteinlawfirm.net

**2. SERVED BY UNITED STATES MAIL:**
On _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _January 27, 2016_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| Hon. Mark S. Wallace<br>U.S. Bankruptcy Court<br>Ronald Reagan Federal Building<br>411 W. Fourth Street<br>Santa Ana, CA 92701 | | |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| __January 27, 2016__ | __Pam Crawford__ | /s/ Pam Crawford |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

102046849.1

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                     **F 9013-3.1.PROOF.SERVICE**